IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
October 8, 2003 Session

## LORRAINE M. MILLER v. BRUCE L. MILLER

**Appeal from the Chancery Court for Williamson County**
**No. 28653     R. E. Lee Davies, Chancellor**

---

**No. M2002-02731-COA-R3-CV - Filed December 10, 2003**

---

The trial court awarded a divorce to a sixty-four year old woman with multiple health problems, and ordered her former husband to pay her $700 per month as alimony *in futuro*. The husband argues on appeal that the trial court erred, because the wife was capable of working, and was therefore only entitled to rehabilitative alimony. We affirm the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court**
**Affirmed and Remanded**

PATRICIA J. COTTRELL, J., delivered the opinion of the court, in which William C. Koch, Jr., P.J., M.S., and FRANK G. CLEMENT, JR., J., joined.

Ernest W. Williams; Anna E. Freeman, Franklin, Tennessee, for the appellant, Bruce L. Miller.

Helen Sfikas Rogers; Lana L. Lennington, Nashville, Tennessee, for the appellee, Lorraine M. Miller.

**OPINION**

**I. The Facts**

　　Bruce and Lorraine Miller first married in 1984. They subsequently divorced, but married again on July 29, 1991. There were no children from either of these marriages, but Lorraine Miller had a daughter and two grandchildren as the result of a still earlier marriage. Ms. Miller is seven years older than Mr. Miller.

　　At the time of the 1991 marriage, Bruce Miller was unemployed, having been laid off from his job at General Motors. Shortly thereafter, Lorraine Miller, who was working for Saturn Corporation, helped her husband find a job there too. In 1994, the parties bought a house in Spring Hill. The wife used $11,564 from an inheritance to cover the closing costs. With the agreement of

her husband, she retired from Saturn in 1999 at the age of 62, and began collecting social security retirement benefits. Her monthly check at the time of trial was $573.

The parties apparently got along fairly well during the first few years of their second marriage. But with the passage of time, Bruce Miller began feeling discontented, and started to take notes as to things that bothered him about his wife. Most of these complaints had to do with his wife's purchasing habits, including buying "nonessentials" without checking with him first, and spending too much money on presents for her grandchildren. Ms. Miller admitted at trial that a lot of what she bought was probably unnecessary. The proof also showed that Mr. Miller himself spent significant sums of money on his own interests, including extensive monthly purchases of comic books and videotapes.

In March of 2001, Lorraine Miller moved out of the marital home with the intention of separating from her husband, and went to New York where she could be closer to her sisters. She testified that she had also hoped that after she moved, Mr. Miller would realize he missed her and ask her to come back. The parties agreed to divide some of their marital property at the time of their separation. Among other things, they refinanced the marital home in order to extract the equity from it. Ms. Miller signed a quitclaim deed as part of the refinancing process. The refinancing generated $64,393 in cash, which the parties divided equally.

About a month after his wife left, Mr. Miller contacted Patricia Tinapple, a former classmate who lived in Arizona. He flew out to Arizona to see her, and they began an intimate relationship. He subsequently returned to Arizona on a frequent basis and paid for Ms. Tinapple to fly to Tennessee to see him. On one trip to Arizona, Mr. Miller spent $1,700 on a wedding ring. He testified that the ring was not for Ms. Tinapple, but for himself.

When Lorraine Miller returned to Tennessee, she quickly discovered that she and her husband would not be getting together again. He remained in the marital home, and she moved into government-subsidized housing. Although the low rent of $162 per month allowed Ms. Miller to stretch her social security check, her income was still far from adequate for her needs. By the time of trial, she had completely depleted the $32,000 she had received from the refinancing of the marital home.

On April 4, 2002, Lorraine Miller filed a Bill for Legal Separation on the ground of inappropriate marital conduct. She asked the court to divide the marital property, and to award her alimony, reasonable attorney fees, and discretionary costs. The husband filed an Answer and Counterclaim for Absolute Divorce. He did not state any grounds for divorce, but denied that he was guilty of inappropriate conduct. He also asked the court to deny his wife's request for alimony and attorney fees.

## II. Divorce Proceedings

The hearing was conducted on September 17, 2002, and began with the wife's attorney asking the court to amend her complaint to make it one for absolute divorce rather than for separation. At the time of trial, Lorraine Miller was sixty-four years old, and Bruce Miller was fifty-seven. Much of Mr. Miller's testimony had to do with financial and property matters. His tax returns showed an income from Saturn of $45,665 in 1998, $56,434 in 1999, $60,000 in 2000, and $56,520 in 2001. He had a vested pension from General Motors that entitled him to $1341 per month at the time of his retirement. His Saturn 401(k) Individual Retirement Account had a value of $74,090.

In contrast, Lorraine Miller had no significant income after her retirement from Saturn, and her retirement account only had a value of $15,110. Ms. Miller also testified as to a long history of health problems she has suffered, including a failed stomach stapling, pancreatitis, hypothyroidism, and irritable bowel syndrome. Because of these problems, she testified that it would be difficult for her to hold down a job. She stated, however, that she would like to do volunteer work at a hospital.

At the conclusion of the proof, the trial court announced its decision from the bench. The decision was memorialized in the Final Decree of October 3, 2002. The court granted the wife's motion to amend her Complaint, and awarded her a divorce on the ground of adultery. Mr. Miller was allowed to keep the marital home, and made solely responsible for the mortgage. Both parties were awarded their own bank accounts and their own retirement and pension benefits, except that Mr. Miller's 401(k) account was to be divided equally between the parties, by a Qualified Domestic Relations Order if necessary.

Finally, the judge found that the wife was in need of support, and that she was not capable of economic rehabilitation because of her age and her physical condition. The judge accordingly ordered the husband to pay $700 a month as alimony *in futuro*. He also awarded the wife her attorney fees, in the amount of $8,000. This appeal followed.

## III. Alimony

Mr. Miller contends on appeal that the trial court erred in awarding his wife alimony *in futuro*. He asserts she does not need support because her expenses are low. He also notes the express legislative preference for rehabilitative alimony, and argues that his former wife should go to work to satisfy her unmet needs. He concludes that her economic situation warrants at most a temporary award of rehabilitative alimony, in an amount less than $700 per month.

Alimony or spousal support is authorized by statute, Tenn. Code Ann. § 36-5-101(a)(1), which gives courts discretion to order "suitable support and maintenance of either spouse by the other spouse . . . according to the nature of the case and the circumstances of the parties. . . ." There are no hard and fast rules for spousal support decisions, and such determinations require a "careful balancing" of the relevant factors. *Anderton v. Anderton*, 988 S.W.2d 675, 682-83 (Tenn. Ct. App.

1998).  In determining whether to award support and the nature, amount and length of such support, the court is to consider all relevant factors, including those enumerated in Tenn. Code Ann. § 36-5-101(d)(1).[1]

Decisions regarding the entitlement to spousal support, as well as the amount and duration of spousal support, hinge on the unique facts of each case, and the court must weigh and balance all relevant factors. *Robertson v. Robertson*, 76 S.W.3d 337, 338 (Tenn. 2002).  Among these factors, the two considered to be the most important are the disadvantaged spouse's need and the obligor spouse's ability to pay. *Robertson*, 76 S.W.3d at 342; *Bogan v. Bogan*, 60 S.W.3d 721,  730 (Tenn. 2001); *Manis v. Manis*, 49 S.W.3d 295, 304 (Tenn. Ct. App. 2001); *Anderton* 988 S.W.2d at 682 (Tenn. Ct. App.1998).  Of these two factors, the disadvantaged spouse's need is the threshold consideration, and the next consideration is the ability of the obligor spouse to provide support.

---

[1]The factors the court must consider in setting the alimony obligation are:

(A) The relative earning capacity, obligations, needs and financial resources of each party, including income from pension, profit sharing or retirement plans and all other sources;

(B) The relative education and training of each party, the ability and opportunity of each party to secure such education and training, and the necessity of a party to secure further education and training to improve such party's earning capacity to a reasonable level;

(C) The duration of the marriage;

(D) The age and mental condition of each party;

(E) The physical condition of each party, including, but not limited to, physical disability or incapacity due to a chronic debilitating disease;

(F) The extent to which it would be undesirable for a party to seek employment outside the home because such party will be custodian of a minor child of the marriage;

(G) The separate assets of each party, both real and personal, tangible and intangible;

(H) The provisions made with regard to the marital property as defined in § 36-4-121;

(I) The standard of living of the parties established during the marriage;

(J) The extent to which each party has made such tangible and intangible contributions to the marriage as monetary and homemaker contributions, and tangible and intangible contributions by a party to the education, training or increased earning power of the other party;

(K) The relative fault of the parties in cases where the court, in its discretion, deems it appropriate to do so; and

(L) Such other factors, including the tax consequences to each party, as are necessary to consider the equities between the parties.

Tenn. Code Ann. § 36-5-101(d)(1).

*Aaron v. Aaron*, 909 S.W.2d 408, 410 (Tenn. 1995) (quoting *Cranford v. Cranford*, 772 S.W.2d 48, 50) (Tenn. Ct. App. 1989)). The concept of relative economic disadvantage incorporates the principles of need and ability to pay.

Among the statutory factors to be considered in deciding whether to award alimony are: the relative earning capacity, obligations, needs, and financial resources of each party; the relative education and training of each party; the ability and opportunity and necessity of each party to secure such education and training in order to improve such party's earning capacity to a reasonable level; and the assets of each party, whether they be separate assets or marital property awarded in the divorce. Tenn. Code Ann. § 36-5-101(d)(1). These factors are relevant to the determinations of relative economic disadvantage as well as need and ability to pay.

Where relative economic disadvantage exists, the legislature has expressed a preference for rehabilitative alimony over long-term, open-ended alimony *in futuro*. Tenn. Code Ann. § 36-5-101(d)(1); *Robertson*, 76 S.W.3d at 339-40; *Burlew v. Burlew*, 40 S.W.3d 465, 470 (Tenn. 2001); *Crabtree v. Crabtree*, 16 S.W.3d 356, 358 (Tenn. 2000). The purpose of an award of rehabilitative alimony is to encourage a divorced spouse to become self-sufficient. *Robertson,* 76 S.W.3d at 339-40; *Burlew*, 40 S.W.3d at 471; *Crabtree*, 16 S.W.3d at 360. Rehabilitative alimony is appropriate where the spouse is economically disadvantaged, but where rehabilitation is possible by the grant of "rehabilitative, temporary support and maintenance," Tenn. Code Ann. § 36-5-101(d)(1), or where it is needed to provide temporary income to support the disadvantaged spouse during the post-divorce economic adjustment. *Robertson*, 76 S.W.3d at 340-41.

In determining whether a disadvantaged spouse can be rehabilitated with short-term support, the court is to consider "every relevant factor." *Id.* at 340. Neither the standard of living the parties enjoyed during the marriage nor the income or earning potential of the other spouse can be used as the sole or determinative factor. *Id.*; *Crabtree*, 16 S.W.3d at 359. Where, considering all the relevant factors, rehabilitation is not possible, the courts should not refrain from awarding long-term support when that support is appropriate under the statutory factors. *Robertson*, 76 S.W.3d at 341-42. The statutory preference for rehabilitative support does not entirely displace other forms of support. *Id.*; *Anderton*, 988 S.W.2d at 682. The support statute itself provides for the grant of an award of support on a long-term basis "where there is such relative economic disadvantage and rehabilitation is not feasible in consideration of all relevant factors." Tenn. Code Ann. § 36-5-101(d)(1). The purpose of alimony *in futuro* is to provide financial support to a spouse who cannot be rehabilitated. *Burlew*, 40 S.W.3d at 470-71.

In this case, Mr. Miller does not dispute that his former wife is economically disadvantaged relative to his own situation. The record shows that the wife's current income from Social Security is only $573 per month, or $6,876 per year. In contrast, Mr. Miller earns well over $50,000 per year, more than seven times as much. At age 57, he can continue to work and generate a good income for a number of years. When he finally retires, he will receive a $1341 per month pension check from General Motors, as well as Social Security. He also has time to make additional contributions to his

401(k) that he will not have to share with his former wife. He lives in a three-bedroom house, while she is in a one-bedroom government-subsidized apartment.

Bruce Miller disputes the trial court's finding that the wife "... was not capable of rehabilitation based on her age, the fact that she had previously retired and her prior job history." The Court found that "while the Wife might be able to work part-time or for a few hours to supplement her income, that she could not support herself."[2] When the trial court has set forth its factual findings in the record, we will presume the correctness of those findings so long as the evidence does not preponderate against them. Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 733 (Tenn. 2001); *Crabtree*, 16 S.W.3d at 360.

Based on our review of the record, we conclude that the evidence does not preponderate against the trial court's finding. To find otherwise, we would have to turn a blind eye to the realities of the modern workplace in order to find that a sixty-four year old woman who is not in the best of health, and who possesses limited skills, would be able to re-enter the workforce after an absence of a number of years, and obtain a job that pays her a living wage. Under the circumstances present in this case, we agree with the trial court that the wife is not capable of rehabilitation.

In addition, trial courts have broad discretion to determine whether spousal support is needed and, if so, its nature, amount and duration. *Burlew*, 40 S.W.3d at 470. Appellate courts are generally disinclined to second-guess a trial court's spousal support decision unless it is not supported by the evidence or is contrary to public policies reflected in applicable statutes. *Bogan*, 60 S.W.3d at 733; *Kinard v. Kinard*, 986 S.W.2d 220, 234 (Tenn. Ct. App. 1998). Our role is to determine whether the award reflects a proper application of the relevant legal principles and that it is not clearly unreasonable. *Bogan*, 60 S.W.3d at 733.

While the retirement and other assets awarded to Ms. Miller might provide her with a cushion, she would be required to deplete those assets in order to maintain herself. In addition, just as the economic factors justify the support awarded, so do the other relevant factors such as Ms. Miller's substantial contribution to the marriage. We affirm the trial court's award of alimony.

### IV. Attorney Fees

Mr. Miller also argues that the trial court should not have ordered him to pay his wife's attorney fees, because the property division left her with enough cash to pay her own attorney. While our opinions may have sometimes seemed to imply that an award of attorney fees in a divorce case is only appropriate when the division of marital property has left one of the parties without sufficient funds to pay such fees, we believe it is more correct to say that an award of attorney fees can be appropriate when the obligee spouse does not have sufficient funds to pay the attorney fees and to meet his or her needs. *See Koja v. Koja*, 42 S.W.3d 94, 100 (Tenn. Ct. App. 2000); *Kinard*, 986 S.W.2d at 236; *Franklin v. Franklin*, 746 S.W.2d 715, 719 (Tenn. Ct. App. 1987).

---

[2]The trial court made it clear that it expected Ms. Miller to work at least part time.

Historically, an award of attorney's fees in divorce cases was based on the theory that the wife was entitled to an award of attorney's fees because, where the husband provided the only financial support to the family, the award of attorney's fees in divorce cases allowed the wife access to the court system. In more recent years, it has become well settled that an award of attorney's fees in divorce cases is considered alimony or spousal support, generally characterized as alimony *in solido*. *Yount v. Yount*, 91 S.W.3d 777, 783 (Tenn. Ct. App. 2002); *Miller v. Miller*, 81 S.W.3d 771, 775 (Tenn. Ct. App. 2001); *Wilder v. Wilder*, 66 S.W.3d 892, 894 (Tenn. Ct. App. 2001). A number of cases cite as the basis for attorney's fees as an award of alimony Tenn. Code Ann. § 36-5-101(a)(1), which authorizes courts to order "suitable support and maintenance of either spouse by the other spouse . . . according to the nature of the case and the circumstances of the parties. . . ." *See, e.g.*, *Mitts v. Mitts*, 39 S.W.3d 142, 147 (Tenn. Ct. App. 2000); *Smith v. Smith*, 912 S.W.2d 155, 160-61 (Tenn. Ct. App. 1995); *Gilliam v. Gilliam*, 776 S.W.2d 81, 86 (Tenn. Ct. App. 1988).

Because attorney's fees are considered alimony or spousal support, an award of such fees is subject to the same factors that must be considered in the award of any other type of alimony. *Yount*, 91 S.W.3d at 783; *Lindsey v. Lindsey*, 976 S.W.2d 175, 181 (Tenn. Ct. App. 1997). Therefore, the statutory factors listed in Tenn. Code Ann. § 36-5-101(d)(1) are to be considered in a determination of whether to award attorney's fees. *Langschmidt v. Langschmidt*, 81 S.W.3d 741, 751 (Tenn. 2000); *Kincaid v. Kincaid*, 912 S.W.2d 140, 144 (Tenn. Ct. App. 1995).

As with other forms of spousal support, the need of the spouse requesting the award of attorney's fees is the single most important factor, and the obligor spouse's ability to pay is also an important consideration. *Miller*, 81 S.W.3d at 775; *Hazard v. Hazard*, 833 S.W.2d 911, 917 (Tenn. Ct. App. 1991). Courts have held that in determining whether to award attorney's fees as spousal support, the most important factors are the real need of the disadvantaged spouse, a demonstrated financial inability to obtain counsel, and the ability of the obligor spouse to pay. *Wilder*, 66 S.W.3d at 895; *Cranford*, 772 S.W.2d at 50. In a recent opinion, the Supreme Court reaffirmed the holding in *Fox v. Fox*, 657 S.W.2d 747, 749 (Tenn. 1983), that an award of attorney's fees "is conditioned upon a lack of resources to prosecute or defend a suit in good faith . . ." and that such an award is to ensure access to the courts. *Langschmidt*, 81 S.W.3d at 751.

An award of attorney's fees as alimony is considered to be within the sound discretion of the trial court *Miller*, 81 S.W.3d at 776; *Loyd v. Loyd*, 860 S.W.2d 409, 413 (Tenn. Ct. App. 1993). Consequently, such an award will not be reversed on appeal if that discretion is not abused. *Yount*, 91 S.W.3d at 783; *Garfinkle v. Garfinkle*, 945 S.W.2d 744, 748 (Tenn. Ct. App. 1996); *Lyon v. Lyon*, 765 S.W.2d 759, 762-63 (Tenn. Ct. App. 1988). Although other standards of review have been expressed in some cases, the Tennessee Supreme Court has made it clear that "[t]he allowance of attorney's fees is largely in the discretion of the trial court, and the appellate court will not interfere except upon a clear showing of abuse of that discretion." *Aaron*, 909 S.W.2d at 411 (citing S*torey v. Storey*, 835 S.W.2d 593, 597 (Tenn. Ct. App. 1992) and *Crouch v. Crouch*, 53 Tenn. App. 594, 606, 385 S.W.2d 288, 293 (Tenn. Ct. App. 1964)).

Under the abuse of discretion standard, a trial court's ruling "will be upheld so long as reasonable minds can disagree as to the propriety of the decision made." A trial court abuses its discretion only when it "applies an incorrect legal standard, or reaches a decision which is against logic or reasoning or that causes an injustice to the party complaining." The abuse of discretion standard does not permit the appellate court to substitute its judgment for that of the trial court.

*Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001) (citations omitted).

In the present case, Ms. Miller obviously does not have enough monthly income to pay the fees. Consequently, she would have to significantly deplete the assets that she was awarded in order to pay $8,000 in attorney fees. We do not believe the trial court abused its discretion when it protected her assets by ordering Mr. Miller to be responsible for those fees. Consequently, we affirm that award.

Ms. Miller also argues that we should award her the attorney fees she has incurred in responding to Mr. Miller's appeal. We believe her argument is well-taken, since the same reasoning that supports the award of attorney fees at trial remains applicable, and since she would not have incurred those fees if Mr. Miller had not chosen to appeal the alimony award. We therefore order Mr. Miller to pay his former wife's attorney fees on appeal after the trial court determines the correct amount.

## V.

The judgment of the trial court is affirmed. This cause is remanded to the Chancery Court of Williamson County for further proceedings consistent with this opinion, including a determination of the attorney fees on appeal that Mr. Miller should be obligated to pay. The costs on appeal are taxed to the appellant, Bruce L. Miller.

_____
PATRICIA J. COTTRELL, JUDGE